**In re Adrian a/k/a Adriano GUGLIADA, Debtor.**

**Bankruptcy No. 81 B 20478.
Adv. No. 82–6010.**

United States Bankruptcy Court,
S. D. New York.

June 2, 1982.

Casey, Haythe & Krugman, New York City, for Christie's (International) SA.

Joel S. Sankel, New York City, for debtor.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Plaintiff, Christie's (International) S.A., filed a complaint objecting to the debtor's discharge on grounds delineated under 11 U.S.C. § 727, subdivisions (a)(2) (fraudulent transfer within one year); (a)(3) (failure to keep records as to the debtor's financial condition or business transactions); (a)(4) (false oath); and (a)(6) (refusal to obey a lawful order of this court). Three of the four listed creditors of this debtor, including the plaintiff, hold claims arising out of the debtor's issuance of promissory notes with respect to a business transaction involving the debtor's purchase of jewelry for resale. The fourth creditor is the debtor's attorney who holds a claim for legal fees incurred in the course of defending the debtor in a state court case brought by the plaintiff as a holder in due course of three of the notes. Thus, the debtor's financial demise and resultant Chapter 7 petition arose out of that single transaction wherein the debtor sought to import from Italy certain jewelry items for which he gave his associate in Italy twenty promissory notes reflecting the purchase price. The debtor never received the jewelry. However, before the debtor's associate in Italy committed suicide he negotiated three of the notes to the plaintiff, a well-known auction house and dealer in valuable merchandise.

## FACTS

1. On August 8, 1981, the debtor filed with this court a petition for relief under Chapter 7 of Title 11 of the United States Code, together with a Statement of Financial Affairs For Debtor Not engaged in Business, together with supporting schedules. The debtor listed his debt to plaintiff in Schedule A–3 of his Chapter 7 petition. Plaintiff filed a proof of claim on September 15, 1981.

2. Plaintiff's proof of claim is based upon a judgment it obtained against the debtor on April 15, 1981 in the sum of $195,064, upon a jury verdict in plaintiff's favor in the Supreme Court of the State of

New York for the County of New York. The judgment was based upon three promissory notes from a series of twenty notes that the debtor issued in late 1975 or early 1976. As to the notes, the jury found the plaintiff to be a holder in due course. The notes were originally issued to the debtor's business associate in Italy, one Pierino Frascarola.

3. The three notes held by the plaintiff were for the sum of $48,350 due on June 30, 1976, $54,105 due on July 31, 1976 and $48,980 due on July 31, 1976 and were payable at Manufacturers Hanover Trust Company, in New York City. The notes were never paid by the debtor when they came due.

4. In September, 1976 plaintiff commenced an action against the debtor in the Supreme Court of the State of New York which ultimately resulted in the judgment upon which plaintiff's claim is bottomed.

5. The other three creditors of this estate are: Dr. Roberto Caro, Administrator of the Estate of Frascarola (the debtor's deceased former business associate), as holder of five of the series of twenty promissory notes; Dr. Roberto Caro, individually, as holder of the remaining twelve promissory notes issued by the debtor to Frascarola. The only other creditor is the debtor's current attorney who holds a claim for $10,000 for legal services rendered with respect to the plaintiff's action against the debtor as a holder in due course of three of the notes, which resulted in the judgment in plaintiff's favor in the sum of $195,064.60.

6. In 1975, the debtor was president and a director of Frascarola & Co., Inc., a New York corporation then located at 745 Fifth Avenue, in New York City. The debtor owned fifty per cent of the shares of the corporation; Pierino Frascarola, a citizen and resident of Italy, owned the other fifty per cent. Commencing in 1966, Frascarola & Co. Inc. was engaged in the business of importing, buying and selling gold and silver items. In December of 1975, a certificate of dissolution was filed for Frascarola & Co., Inc. However, the corporation continued to do business in 1976, as reflected by the corporate income tax return cover-

ing the fiscal period from March 1, 1976 through February 28, 1977. [Exhibit 11]

7. In early 1976, the debtor arranged to purchase and import certain jewelry items from Italy that the debtor's associate, Frascarola, was to acquire. This transaction was not structured through the corporation Frascarola & Co., Inc. It was an independent venture between the debtor, individually, and Pierino Frascarola, individually. The debtor testified that this was the first time that he had engaged in this type of transaction on his own. The debtor issued to Pierino Frascarola a series of twenty notes, payable at various intervals in 1976, totalling $1,006,380. The debtor never received any of the merchandise for which the notes were given. However, before Pierino Frascarola committed suicide, he managed to negotiate three of the notes to the plaintiff, who thereafter, as a holder in due course, obtained a judgment against the debtor for $195,064.60 on April 15, 1981.

8. On July 20, 1976, Manufacturers Hanover Trust Company protested the three promissory notes for nonpayment. On July 26, 1976, the debtor conveyed his interest in his home in Congers, New York, which was then owned jointly by the debtor and his wife, to his wife exclusively, for no consideration. In an unsuccessful action brought by the trustee to set aside this transfer as a fraudulent conveyance in violation of the New York Debtor and Creditor Law, this court held that the trustee had not established that the debtor was insolvent at the time of the transfer. It developed at that trial that the consideration for the purchase of the home had been obtained from the debtor's wife and father-in-law.

9. After July 26, 1976 and continuing to the present time, the debtor has continued to reside at the Congers property and remains liable to the Eastchester Savings Bank under the bond and extension agreement, secured by a first mortgage on the Congers property, pursuant to which the debtor and his wife jointly agreed to pay Eastchester Savings Bank the sum of $33,000 in stated installments from July 1, 1968 through June 1, 1998.

10. Since 1967, when the debtor first went into business with Frascarola as a fifty per cent shareholder in Frascarola & Co., Inc., it was his custom to turn over to his wife, Diana Gugliada, all of the funds he received as salary. Some time in 1976, after Frascarola & Co. Inc. was dissolved, a new corporation, known as Citigold, Inc., was formed. The debtor was employed by Citigold, Inc. as sales manager. The debtor claims he was not the president of Citigold, Inc. although his business cards, which he gave to customers, lists him as the president [Exhibit 12]. The debtor's wife and son are also employees of Citigold, Inc. The debtor is authorized to sign checks of Citigold, Inc. without any cosignatories. Similarly, the debtor's wife is authorized to sign Citigold, Inc. checks without any other cosignatories. Citigold, Inc. is located at the same address as the former Frascarola & Co., Inc., although it occupies different offices.

11. Citigold, Inc. is engaged in the business of importing and selling jewelry. Originally all of the capital stock of Citigold, Inc. was owned by Constantino Saglio, the debtor's father-in-law. Sometime thereafter, all of the capital stock was transferred to Stefano Verita, who, like the late Pierino Frascarola, is a citizen and resident of Italy, and does not exercise day to day supervision of Citigold, Inc. Indeed, there was no evidence that either Mr. Saglio or Mr. Verita contributed any capital to Citigold, Inc. or paid any consideration for their shares. The debtor testified that the books and records of Citigold reflect that it owes Mr. Verita approximately $100,000 for advances. These books and records were not produced as to this point, although advances or loans are not synonymous with capital contributions. Mr. Verita is not authorized to sign checks drawn on Citigold's bank accounts, nor does he draw a salary or receive any dividends. The debtor is one of the highest paid employees of Citigold, Inc. and manages its affairs with unlimited access to its funds. The debtor was responsible for hiring all but one of the eight employees of Citigold, Inc. His son hired one of the employees.

12. As was his practice while employed by Frascarola & Co. Inc., the debtor turned over to his wife, Diana Gugliada, all of the funds he received as salary from Citigold, Inc.

13. The debtor's wife deposited all of the debtor's salary checks in a checking account maintained solely in her name at the Nanuet National Bank. The debtor's wife is the only person who may withdraw funds from this account. The funds in this account were used to pay the mortgage obligation, bills for heat, taxes, utilities, insurance, repairs and household expenses. The debtor never had a checking account, although he did have a savings account with Manufacturers Hanover Trust Company, which was attached after the problem arose with respect to the promissory notes in question. The debtor's wife also deposited her earnings in the checking account maintained at the Nanuet National Bank.

14. The debtor testified that his wife gave him the money he needed for his weekly expenses after he turned over to her his salary check for deposit in her checking account. The debtor did not list in his schedules his wife's checking account as property in which he had any interest.

15. The debtor did not list in his schedules the 20 shares of the common stock of Frascarola & Co. Inc., representing the fifty per cent interest of the debtor in that corporation.

16. After Frascarola & Co. Inc. was dissolved, the debtor removed the corporate books and records to his garage at home and thereafter disposed of some of the books and records. The debtor did retain the corporate Federal income tax returns of Frascarola & Co., Inc. for 1975 and 1976, some incomplete cash receipts and disbursements ledgers for 1976 and part of 1977 and the corporation's Articles of Incorporation.

## DISCUSSION

Several of the objections to the debtor's discharge are based upon a literal failure to satisfy the prerequisites for obtaining a discharge under 11 U.S.C. § 727. Other objections are more penetrating.

### Financial Records—Code § 727(a)(3)

■ Plaintiff urges that the debtor "has concealed, destroyed . . . or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained . . .", as proscribed under 11 U.S.C. § 727(a)(3). In support of this position the plaintiff relies upon the debtor's admission that after the dissolution of Frascarola & Co., Inc. in 1975, a corporation in which the debtor had a fifty per cent interest, he removed the corporate books and records to his garage at home, where they were stored until he disposed of some of the records when he needed the storage space. The debtor did produce some incomplete corporate records and the corporation's Federal income tax returns for its last two years. The failure to retain all of these records until August 8, 1981, when the debtor filed his Chapter 7 petition is justifiable in the circumstances and does not by itself warrant a denial of the debtor's discharge.

### Failure to Respond Fully to a Subpoena—Code § 727(a)(6)

■ The plaintiff served the debtor with a subpoena for the production of the corporate accounting, tax and inventory records for the years 1976 through 1981 of Citigold, Inc., the corporation managed by the debtor and formed after the dissolution of Frascarola & Co., Inc. The debtor testified that he produced three cartons of records for the plaintiff and that he was waiting for the return of these records before he would turn over additional records. The records that were turned over included the federal income tax returns for Citigold, Inc. for the calendar years 1977, 1978 and 1979. While the debtor's failure to comply fully with the court-ordered subpoena is not condoned, nevertheless there may have been a breakdown in communications or a misunderstanding. In any event, it does not appear that "the debtor has refused, in the case . . . to obey any lawful order of the court", as proscribed under 11 U.S.C. § 727(a)(6), so as to justify the denial of his discharge on this ground alone.

### Not Disclosing Dissolved Corporate Shares—Code § 727(a)(4)

■ The debtor did not disclose in his Chapter 7 petition and supporting papers that he was the owner of fifty per cent of the common stock of Frascarola & Co., Inc., a corporation that was dissolved by the filing of a Certificate of Dissolution in December, 1975. The debtor contends that since the corporation was dissolved, the stock is worthless. There is no question that a debtor must answer the schedules and statement of affairs with utmost candor. The debtor's creditors are "entitled to inquire into what property passed through the bankrupt's [now debtor's] hands during a period prior to his bankruptcy." *In re Slocum*, 22 F.2d 282, 285 (2d Cir. 1927). Statements called for in the schedules must be treated seriously. A reckless indifference to the truth is the equivalent of fraud. *In re Diorio*, 407 F.2d 1330 (2d Cir. 1969). It is not for the debtor to determine which assets should be disclosed to his creditors. *In re Vincent E. Condura*, 5 B.C.D. 578 (Bkrtcy.S.D.N.Y.1979).

■ Code § 727(a)(4)(A) authorizes a denial of the debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case—(A) made a false oath . . .". In this case there is no proof that the dissolved corporate shares had any value apart from the paper they were printed on. All four creditors in this case knew that Frascarola & Co., Inc. was dissolved and inactive some years before the debtor filed his Chapter 7 petition. Although this is no excuse for the debtor's failure to comply literally with the disclosure requirements under the Bankruptcy Code, nevertheless, this lapse in form over substance should not of itself result in a determination that the debtor "knowingly and fraudulently" made a false oath by not disclosing the existence of these shares. As was stated in *In re McCrea*, 161 Fed. 246 at 249 (2d Cir. 1908):

"A bankrupt is not guilty of making a false oath when he omits from his sworn

schedule securities which are absolutely worthless."

Manifestly, an average debtor might reasonably believe that the stock was of no value and therefore forget to mention it in the schedules.

### Other Alleged Business Ventures—Code § 727(a)(4)

■ Plaintiff notes that in the debtor's Statement of Financial Affairs he certified that he had not been in a partnership with anyone or engaged in any business during the six years immediately preceding the filing of his Chapter 7 petition. However, the debtor did engage in at least one personal venture on his own account; namely the transaction with Frascarola pursuant to which three of the promissory notes were negotiated to the plaintiff as a holder in due course. Additionally, it appears that the debtor did engage in some business transactions as president of A.S.G. Imports, Inc., another jewelry import company, the capital stock of which is owned by the debtor's wife. However, there was no proof that the debtor engaged in these transactions in any capacity other than as an employee of A.S.G. Imports and in its behalf. The plaintiff also maintains that the debtor must have engaged in business ventures in his individual capacity because his 1975 and 1976 federal income tax returns reveal commission income of $4,551 [Exhibit 18] and $3226 [Exhibit 19]. However, these income tax returns were the joint returns of the debtor and his wife. There was no proof that the commissions were earned solely by the debtor and not his wife, who was the shareholder of A.S.G. Imports and who is actively employed in the jewelry importation business.

Hence, there is proof of only one instance where the debtor actually engaged in a business transaction individually in which he was to earn commissions, but did not earn any because the deal fell through when Frascarola apparently failed to ship the merchandise, despite the fact that the debtor issued a series of twenty promissory notes, three of which were negotiated to the plaintiff as a holder in due course. From these facts, it cannot be held that the debtor "knowingly and fraudulently" made a false oath when he certified that during the six years immediately preceding the filing of his Chapter 7 petition he had not been in partnership with anyone or engaged in any business individually, other than as disclosed in his petition and supporting papers.

### Transfer of Salary to the Debtor's Wife—Code § 727(a)(2)

■ The plaintiff alleges that the debtor, with intent to hinder, delay and defraud creditors, transferred and concealed property of the debtor within one year before the date of the filing of the Chapter 7 petition and property of the estate after the filing of the petition, as proscribed under 11 U.S.C. § 727(a)(2). This charge is grounded on the admitted fact that during those periods the debtor transferred to his wife his full salary checks which she deposited in her checking account and with respect to which only she had the right to withdraw funds. In return, the debtor received an allowance from his wife to cover his weekly expense requirements. Apart from also questioning this arrangement on the theory of a concealed equitable interest, which will later be covered in the context of a false oath under 11 U.S.C. § 727(a)(4), the plaintiff charges that the debtor's transfers of his salary checks warrant a denial of his discharge under 11 U.S.C. § 727(a)(2).

Unlike 11 U.S.C. § 548(a)(2), which proscribes transfers that are presumed fraudulent because of insufficient consideration received, 11 U.S.C. § 727(a)(2) requires actual intent to hinder, delay or defraud because constructive fraudulent intent, such as would suffice to avoid a transfer under 11 U.S.C. § 548(a)(2) cannot be the basis for the denial of a discharge. *In re Adlman*, 541 F.2d 999 at 1003 (2d Cir. 1976). See also *In re Rubin*, 12 B.R. 436 (Bkrtcy. S.D. N.Y.1981). The Court of Appeals emphasized this point in the *Adlman case*, supra, when it said at page 1005:

530

"Absent convincing evidence of *extrinsic fraud*, it was incorrect as a matter of law for the Bankruptcy Judge to conclude that appellant had actual intent to defraud her creditors." [Emphasis added]

The debtor's wife testified that her husband customarily turned over to her his salary from the time he was involved in the business of Frascarola & Co. Inc. back in 1967. This point rebuts any presumption of actual fraud during the twelve months immediately preceding the filing of the Chapter 7 and shifts to the plaintiff the burden of going forward with the evidence, as part of the plaintiff's burden of proof. See *In re Rubin*, supra. The plaintiff has not established by a preponderance of the evidence that the debtor's transfer of his salary checks to his wife was accompanied by an actual intent to hinder, delay or defraud his creditors.

The plaintiff's reliance on *In re Gurney*, 71 F.2d 144 (2d Cir. 1934) is misplaced. There the court found that the bankrupt's transfer of his salary check to his wife was reasonable grounds for believing that the bankrupt committed a fraudulent transfer, thereby shifting the burden of proof to the bankrupt, as then provided under Section 14c of the former Bankruptcy Act. This rule was superseded by Bankruptcy Rule 407, which provides that the burden of proof remains with the objecting party. Under the current Bankruptcy Code, the provision for shifting the burden of proof to the debtor was not reincorporated in 11 U.S.C. § 727. Although a bankrupt's transfer of all of his income to his wife was found to be a fraudulent transfer with actual intent to hinder creditors in *In re Leach*, 1 B.R. 775 (Bkrtcy.Md.1980), the court found extrinsic evidence of such intent because the transfer occurred after a creditor had attached the debtor's bank account. Before the attachment of his account, the debtor used to deposit his income in an account on which he was the signatory. In the instant case, it was the bankrupt's practice since as far back as 1967 to turn over his entire income to his wife. Thus, the plaintiff has not established any evidence of extrinsic fraud surrounding the transfer of salary.

The case of *In re Vecchione*, 407 F.Supp. 609 (D.C.E.D.N.Y.1976), which is also cited by the plaintiff, was not decided on the basis of a fraudulent transfer with actual intent to hinder creditors by reason of the bankrupts' practice of turning over to their wives their entire earnings, less retained personal expenses. Instead, the case was decided on the theory of fraudulent concealments of assets. The District Court ruled that the objectants proved that "the bankrupts have retained interests in assets transferred to their wives and that their concealments were sufficiently knowing and fraudulent to bar their discharges . . .". *In re Vecchione*, supra, at page 619. The issue of concealment of assets relates to the plaintiff's objection bottomed under 11 U.S.C. § 727(a)(4)(A), involving a false oath, and will be discussed next.

*Equitable Interests in the Bank Account, the Congers Property and Citigold, Inc.*

■ The plaintiff argues that the debtor should be denied a discharge for making false oaths in connection with the accompanying schedules submitted with his petition for relief. It relies on 11 U.S.C. § 727(a)(4)(A) of the Bankruptcy Code which is set forth as follows:

"§ 727. Discharge

(a) The court shall grant the debtor a discharge, unless—

.     .     .     .     .

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account; . . ."

The plaintiff reasons that the omission from the debtor's schedules of his equitable interests in the Nanuet Bank account, the house in Congers, N.Y., and Citigold, Inc. facilitated a concealment of the debtor's assets from his creditors and constituted a false oath as to the assets comprising the estate.

## The Bank Account

The debtor was not permitted to withdraw money from the checking account established at the Nanuet Bank as only his wife's name appeared on the signature card of the account. The account was opened on July 14, 1976, at a time when the debtor was in no financial position to pay the series of promissory notes, three of which were negotiated to the plaintiff. The debtor regularly turned over his paychecks to his wife, who in turn deposited them in the Nanuet account. The debtor was given an allowance for his weekly personal expenses, and if he needed additional funds he simply requested them from his wife. In the case of *In re Vecchione*, 407 F.Supp. 609 (E.D.N.Y.1976), a father and son's salary checks were turned over to their respective wives, who then deposited the funds in their respective Totten trust accounts, established for the benefit of the husbands, and under which the wives were the sole signatories. The money was held in trust for the husbands, but whenever they needed a "loan" their wives turned over the requested sums. The court ruled that the bankrupt husbands possessed equitable interests in these accounts since the source of the funds in these accounts could be traced to their own salary checks (the wives had no income of their own). Thus these funds were "tapped" through the conduit of their wives while remaining invisible to creditors. The court stated that the hidden equitable interests in the accounts constituted a fraudulent concealment of assets that should have been reported in the bankrupt's schedules. This concealment, added to the discovery of other hidden interests, lead the court to deny the bankrupts' discharges.

In the instant case, the fact that the debtor's wife was employed and earned her own money which she deposited in the same account, does not diminish the applicability of *Vecchione*, supra. The debtor's salary checks were shielded from creditors behind the wall of his wife's account, while he continued to enjoy unfettered access to them. Accordingly, this court finds that the debtor possesses an equitable interest in his wife's account consisting of at least the value of his salary checks that were deposited in the account.

## The Congers, N.Y. Property

Title to the home is in Mrs. Gugliada, although when the house was first purchased in 1968, title was jointly held, ostensibly to facilitate the mortgage arrangements. The debtor transferred the property to his wife in 1976 and she is now sole owner. However, the debtor's paychecks deposited in his wife's checking account were used towards the payment of the mortgage (under which the debtor remains liable), taxes, insurance and maintenance of the home. Thus, the debtor's income contributes to the accumulation of equity in the home while he continues to reside there and enjoy all the benefits of owning a home. The plaintiff argues that the use of the debtor's salary to pay the mortgage and related expenses establishes an equitable interest in the house that should have been scheduled in the statements attached to his petition.

The cases of *In re Elliott*, 83 F.Supp. 771 (E.D.Pa.1948), *In re Walter*, 67 F.Supp. 925 (S.D.N.Y.1946), and *In re Vecchione*, 407 F.Supp. 609 (E.D.N.Y.1976) support the plaintiff's position. *In Elliott, supra,* the bankrupt's wages were used to pay off the mortgage on a home, although his wife held title to the home from the time of purchase, and had made the initial down payment on the property. The court noted that at the time she could not manage the mortgage installments without her husband's financial assistance. The court found that "subject to her equity therein, the bankrupt's wife holds the property upon a constructive trust for his creditors." [Footnotes omitted] 83 F.Supp. at 773. The court observed that "[w]ith respect to the sum used by him to pay off the mortgage, it was the same, if not worse, than if he had bought the property in his own name and then transferred it to his wife subject to a secret trust in his favor. Hence we must hold, as did the referee, that the transfer amounted to a fraudulent concealment of his assets ..." 83 F.Supp. at 773–4. The court denied the bankrupt's discharge.

Similarly in *Walter*, supra, the bankrupt contributed substantially to the cash down payment on a home, and thereafter made mortgage and tax payments solely from his personal funds, while title was held in his wife's name. The court found that the bankrupt had a beneficial interest in the property at least to the extent of the money paid by the bankrupt towards the purchase price. This interest had been concealed through its omission from his schedules, resulting in a false oath which necessitated the denial of the bankrupt's discharge.

In *Vecchione*, supra, the husband and his son (both bankrupts) turned over to their respective wives their income, from which the wives paid the mortgages and related expenses of their respective homes. Title to the homes was held by the wives, who had "paid" consideration (far below the estimated equity of the homes) for the transfer to themselves of their husbands' interests in their respective homes. The court held that since all the funds held by the wives derived from their husband's paychecks, in effect the husbands had paid themselves for the transfer of their interests in the property. The court found that since the husbands enjoyed all the benefits of the homes by their continued residence in the homes and paid all of the mortgage installments and other expenses, they possessed equitable interests in their respective homes.

The *Vecchione* court, supra, distinguished *In re Molden*, 300 F.2d 5 (7th Cir. 1962), where the bankrupt's wife had purchased the home from her husband with a downpayment of her *own* money, followed by payment of the mortgage, taxes and other expenses also with her own funds. Under those circumstances, the *Molden* court, supra, declined to find that there was a secret trust through which the bankrupt continued to live on the premises. In comparing *Molden* to the facts presented in *Vecchione*, the latter court observed that "[h]ere, all expenses relating to the houses were paid both before and after the conveyances out of money earned by the bankrupts." 407 F.Supp. at 617. Thus, the *Vecchione* court concluded that "the bankrupts have re-tained equitable interests in assets transferred to their wives and that their concealments were sufficiently knowing and fraudulent to bar their discharge . . . ." 407 F.Supp. at 619.

In the present case, as in *Vecchione*, the expenses relating to the house were paid both before and after the change from joint to sole ownership out of money earned by the debtor. The fact that Mrs. Gugliada also worked and earned her own money does not detract from the efficacy of *Elliott*, *Walter* and *Vecchione*, supra, cases in which the bankrupts' wives had little or no funds of their own. Mrs. Gugliada could not cover all of the home related expenses solely with her own salary. The debtor's equitable interest in the Congers property extends to at least the amount of the funds he contributed toward the mortgage and other expenses.

The plaintiff also cites *In re Davis*, 404 F.2d 312 (2d Cir. 1968), but to some degree that case is distinguishable. In *Davis*, the bankrupt transferred his interest in a home to his wife and father-in-law for no consideration, while continuing to reside there. However, he had indicated in several written financial statements that he had an interest in the home. In the present case, the debtor has consistently held himself out as owning no interest in the Congers property. However, it is noted that the court in *Davis* observed that the payments for the maintenance of the house were made by the bankrupt's wife from sums of money "almost equaling Mr. Davis' weekly salary which he turned over to her each week . . . . This is some evidence that Davis considered the home his own and retained at least a beneficial interest in it." 404 F.2d at 314. The court held that Davis' failure to schedule his interest in the home constituted a fraudulent concealment and his discharge was denied.

### Citigold, Inc.

Although the debtor listed Citigold, Inc. in his Statement of Affairs as his employer for the past four years, the plaintiff argues

that the debtor holds an equitable interest in the company that was not reflected in his schedules. The debtor has testified that he is merely employed as sales manager of the company and owns no stock of the corporation; that his father-in-law, one Constantino Saglio, nominally owned the shares at the inception of the business, and that thereafter one Stefano Verita became the record owner of the stock. However, the status of record title to property is not determinative of equitable ownership. *In re Vecchione*, 407 F.Supp. 609, 617 (E.D.N.Y.1976). When dealing with clients, the debtor has held himself out as president of Citigold, Inc., notwithstanding his contention that he was the "sales manager". He enjoys the right to sign corporate checks, as does his wife who is also an employee of Citigold, Inc. All of the employees save one were hired by the debtor. The debtor claims to be in close contact with Verita who lives in Italy and has made loans to the corporation but no capital contributions, and thus appears to hold no equity in the organization. The debtor's son is also employed there. The debtor appears to have a free hand in making decisions and overseeing the daily affairs of the company. In short, Citigold is "a vehicle for the operation of defendant's business." (Plaintiff's brief, p. 16). The debtor appears to enjoy at least an equitable interest in a company that for all practical purposes is a family enterprise orchestrated by the debtor. See, *In re Diorio*, 297 F.Supp. 842 (S.D.N.Y. 1968), aff'd, 407 F.2d 1330 (2d Cir. 1969).

The concealment of the debtor's equitable interests in the bank account, the home and the business must have been knowing and fraudulent in order to deny the debtor's discharge under 11 U.S.C. § 727(a)(4). In the case *In re Slocum*, 22 F.2d 282, 285 (2d Cir. 1927), where a debtor had testified falsely, the court stated that:

"The words of the statute requiring that the testimony be given 'knowingly and fraudulently' mean no more than 'an intentional untruth in a matter material to the issue which is itself material.'" [Quoting *In re Troeder*, 150 F. 710, 713 (1st Cir. 1906).

The materiality of the false oath is not determined by ascertaining its detrimental effect on creditors. *In re Slocum*, 22 F.2d at 285. Rather, materiality depends on

"whether the inquiry bears a relationship to the bankrupt's business transactions or his estate ... or concerns the 'discovery of assets, business dealings and relations of the bankrupt, the existence and disposition of his property and debts and the like'" [Citation omitted]; *In re Steiker*, 380 F.2d 765, 768 (3d Cir. 1967).

The debtor has retained equitable interests in the assets transferred to his wife, and it has been found that he holds an equitable interest in Citigold, Inc., and is enjoying the benefits of these assets, notwithstanding that he is devoid of legal title. These concealments were knowing and fraudulent. Any argument that the omissions were inadvertent would strain credulity. These three omissions, together with those discussed earlier have a cumulative effect, evidencing a "pattern of reckless and cavalier disregard for the truth serious enough to supply the necessary fraudulent intent required by § 727(a)(4)(A)." *In re Diodati*, 9 B.R. 804, 808 (Bkrtcy.D.Mass.1981).

"Successful administration of the Bankruptcy Act hangs heavily on the veracity of statements made by the bankrupt .... Statements called for in schedules ... must be regarded as serious business; reckless indifference to the truth ... is the equivalent of fraud." *In re Diorio*, 407 F.2d 1330, 1331 (2d Cir. 1969).

"[T]he purpose of lawmakers was to grant [a discharge] only to the honest bankrupt who surrenders all that he possesses to his creditors and not to one who by a process of legal necromancy is living in luxury upon an estate which equitably belongs to them. It would be an exceedingly narrow construction to hold that the bankrupt avoids the charge of concealment because he informs the trustee of the plan adopted to effectuate the fraud." *In re Quackenbush*, 102 F. 282, 285 (N.D.N.Y.1900).

Accordingly, this court may not grant a discharge to a debtor who insulates his financial affairs from his creditors after he realizes he may be held to answer for a substantial indebtedness on promissory notes which he could not pay. The opening of a bank account which could be drawn upon only by the debtor's wife; the transfer to her of his entire income with the right to call upon her to give him whatever expense money he needed; the establishment of a company at the same address as his former corporation where he had unfettered control of the management and funds of a company nominally controlled by a resident of Italy, and the fact that the nominal shareholder made no capital contribution and had no right to draw corporate checks, present a picture of cumulative concealment of assets and a violation of the principle that a debtor must completely and honestly disclose his financial condition to his creditors if he is to earn his discharge.

## CONCLUSIONS OF LAW

1. The plaintiff has failed to sustain its burden of proving that the debtor, with intent to hinder, delay or defraud creditors has transferred property of the debtor, within one year before the date of filing of the Chapter 7 petition, as proscribed under 11 U.S.C. § 727(a)(2).

2. The plaintiff has failed to sustain its burden of proving that the debtor failed to keep or preserve any recorded information, including books, documents, records and papers from which his financial condition or business transactions might be ascertained, as required under 11 U.S.C. § 727(a)(3).

3. The plaintiff has failed to sustain its burden of proving that the debtor has refused to obey any lawful order of this court, within the meaning of 11 U.S.C. § 727(a)(6)(A).

4. The plaintiff has sustained its burden of proving that the debtor knowingly and fraudulently, in connection with this case, made a false oath or account as proscribed under 11 U.S.C. § 727(a)(4)(A), in that the debtor concealed his equitable interests in his wife's bank account, the home in which they reside and the business known as Citigold, Inc., which he manages and through which he has unfettered control over its funds.

5. The debtor's discharge must be denied because he was shown to have fraudulently concealed assets from his creditors so that his sworn statement in his petition and supporting papers must be regarded as a false oath and not scrupulously consistent with his financial status.

SUBMIT ORDER on notice.